POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN TALBOT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLOVIN CORPORATION, ADAM FOROUGHI, and MATTHEW STUMPF,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Stephen Talbot ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AppLovin Corporation ("AppLovin" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired AppLovin securities between February 12, 2026 and August 5, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. AppLovin provides end-to-end artificial intelligence- ("AI") powered advertising solutions for businesses to reach, monetize and grow their global audience. Specifically, AppLovin's advertising solutions purport to use AI models to more efficiently match an advertisement to a prospective consumer and help the Company's customers achieve their advertising goals, including those concerning user acquisition.

3. At all relevant times, Defendants have touted the purported strength of AppLovin's AI models as a major driver of the Company's growth, advising investors that AppLovin was "constantly improving" its models. Defendants described a "virtuous cycle" of improvement and revenue, in which better models yielded greater returns for the Company's advertiser customers, thus incentivizing them to increase their spending on AppLovin's services, and/or incentivizing new customers to begin using AppLovin's services. Additional engagement by existing and/or new customers provides AppLovin with additional data, thereby enabling the Company to improve its AI models further. During the Class Period, Defendants advised investors that they had seen

"faster improvements" to their models and that "***we don't really see a reason why that's going to slow down***."[1]

4. Before the Class Period, AppLovin launched a self-service platform for certain customers. On June 22, 2026, AppLovin made this platform, dubbed AppLovin Ads, available to all customers. Among other features, Defendants consistently touted a purportedly forthcoming generative AI video creative tool that would enable customers to create content designed specifically for the AppLovin Ads platform.

5. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the generative AI video creative feature for the Company's AppLovin Ads platform was subject to significant development delays, making its release on the Company's timeline unlikely; (ii) Defendants overstated the constancy with which AppLovin was improving its AI models; (iii) for these reasons, among others, AppLovin had significantly overstated the benefits and reliability of the purportedly "virtuous cycle" and "compounding" value proposition that its AI models provided to customers and to the Company; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6. The truth began to emerge on July 13, 2026, when a Bank of America Securities analyst published a note reporting softer-than-expected e-commerce ad growth for the month of June, raising concerns over the rollout of AppLovin Ads to all advertisers. Bank of America Securities' review of publicly available e-commerce data showed "AppLovin's eCommerce footprint expanded at a slower pace in June", and the analyst concluded that the AppLovin Ads

[1] All emphases herein are added unless otherwise indicated.

GA rollout enjoyed only a "muted . . . start." Accordingly, based on a "slower initial GA ramp", Bank of America Securities lowered its expectations of AppLovin's annual revenue.

7. Following publication of the note, AppLovin's stock price fell $64.13 per share, or 12.65%, to close at $442.85 per share on July 13, 2026.

8. Then, on August 5, 2026, AppLovin issued a press release announcing its financial results for the quarter ended June 30, 2026, and held a conference call to discuss the same. Among other items, AppLovin reported revenue of $1.92 billion, below consensus estimates of $1.94 billion. Defendants attributed their quarterly performance to their "pace of meaningful model improvement", which was "lighter than normal during the quarter." Defendants also revealed that their generative AI video tool was "still [a] work in progress."

9. On this news, AppLovin's stock price fell $82.13 per share, or 19.66%, to close at $335.67 per share on August 6, 2026.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). AppLovin is headquartered in this District, Defendants

conduct business in this District, and a significant portion of Defendants' actions took place within this District.

14. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

15. Plaintiff, as set forth in the attached Certification, acquired AppLovin securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16. Defendant AppLovin is a Delaware corporation with principal executive offices located at 1100 Page Mill Road, Palo Alto, California 94304. The Company's Class A common stock trades in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "APP".

17. Defendant Adam Foroughi ("Foroughi"), AppLovin's Co-Founder, has served as AppLovin's Chief Executive Officer and a member of its Board of Directors at all relevant times.

18. Defendant Matthew Stumpf ("Stumpf") served as AppLovin's Chief Financial Officer at all relevant times.

19. Defendants Foroughi and Stumpf are collectively referred to herein as the "Individual Defendants."

20. The Individual Defendants possessed the power and authority to control the contents of AppLovin's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of AppLovin's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with AppLovin, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

21. AppLovin and the Individual Defendants are collectively referred to herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

22. AppLovin provides end-to-end AI-powered advertising solutions for businesses to reach, monetize and grow their global audience. Specifically, AppLovin's advertising solutions purport to use AI models to more efficiently match an advertisement to a prospective consumer and help the Company's customers achieve their advertising goals, including those concerning user acquisition.

23. At all relevant times, Defendants have touted the purported strength of AppLovin's AI models as a major driver of the Company's growth, advising investors that AppLovin was "constantly improving" its models. Defendants described a "virtuous cycle" of improvement and revenue, in which better models yielded greater returns for the Company's advertiser customers, thus incentivizing them to increase their spending on AppLovin's services, and/or incentivizing new customers to begin using AppLovin's services. Additional engagement by existing and/or new customers provides AppLovin with additional data, thereby enabling the Company to improve its AI models further. During the Class Period, Defendants advised investors that they had seen

"faster improvements" to their models and that "***we don't really see a reason why that's going to slow down***."

24. Before the Class Period, AppLovin launched a self-service platform for certain customers. On June 22, 2026, AppLovin made this platform, dubbed AppLovin Ads, available to all customers. Among other features, Defendants consistently touted a purportedly forthcoming generative AI video creative tool that would enable customers to create content designed specifically for the AppLovin Ads platform.

**Materially False and Misleading Statements Issued During the Class Period**

25. The Class Period begins on February 12, 2026, the day after AppLovin issued a press release announcing its financial results for the quarter and year ended December 31, 2026, and held a conference call to discuss the same. During Defendant Foroughi's prepared remarks on that earnings call, he discussed recent volatility in the Company's share price and attempted to reassure investors that AppLovin was "delivering the strongest operating performance in our history", due in part to "our own AI models". Defendant Foroughi stated further that AppLovin "will grow" as its "internal" AI "continues to improve", stating in relevant part:

> I want to start by addressing what's clearly on many people's minds. While I prefer to ignore short-term fluctuations in the stock price and focus on maximizing value over the long term, the recent volatility warrants addressing. For the past few weeks, there's been a lot of discussion about how AI and competition will challenge our business. ***But when I look at our internal dashboards, we are delivering the strongest operating performance in our history. What's fueling that growth is our own AI models. And as research and AI, both internal and external, continues to improve, our business will grow with it***. There is a real disconnect between market sentiment and the reality of our business.

26. Defendant Foroughi also represented to investors that growth in AppLovin's self-service platform, AppLovin Ads, could meaningfully impact the Company's financial results in the next quarter, stating in relevant part:

> Now that brings me to what we control, performance and culture. Our performance. Our business is executing extremely well. We continue to grow very quickly

> despite the numbers getting much bigger. We delivered strong growth in Q4. ***And despite typical seasonality where Q1 should be softer than Q4, we are guiding to meaningful sequential growth. That reflects both continued strength in gaming and the scaling of our e-commerce and our self-service customers***.

27. During the Q&A portion of this earnings call, when asked about AppLovin's opportunity to grow its e-commerce vertical through AppLovin Ads, Defendant Foroughi again assured investors that AppLovin's AI models "just keep getting better" and indicated that Defendants viewed the current trends associated with the self-service platform positively, stating in relevant part:

> So the e-commerce business obviously has been live with us for 1.5 years. It's doing really well. In Q4, we opened up the self-service platform, referral only. So we're not at the point yet where we're sort of a [general availability ("GA")] type launch. We'll get there. We said first half of this year, that's still on track. ***What gets us excited are a couple of things. One is the current customers that had lapped Q4 2024 into Q4 2025 saw material increases in spend as our models just keep getting better***.
>
> Now remember, this business and the model around this business that drives the value for the advertisers is really in its infancy. It takes us a while to continuously iterate to improve the model. In fact, just a few weeks ago, we had a pretty sizable uplift. So those same customers from the prior year cohort saw big growth. Then you ended up with new customers coming in from the referral program. ***I mentioned on the last earnings call, we were seeing substantial growth there***. We're not going to see anything that's going to impact our overall numbers for a while, ***but we're seeing great trends***. And I'll talk about advertising, leading advertisers into our platform later on the call, but ***we're just seeing numbers that get us excited***.

28. Defendant Foroughi also represented to investors that the AI model that AppLovin uses in its gaming and ecommerce verticals "creates its own memories", "gets smarter", and "based on its own results can improve". He further stated that AppLovin's AI models improve not only through changes the Company makes, but through the addition of new customers who provide AppLovin with additional data it can use to train those models. In fact, Defendant Foroughi represented that AppLovin's e-commerce AI model would improve so quickly that AppLovin

"can't go and track . . . how much the model is improving", and that these improvements would drive growth for the Company, stating in relevant part:

> ***[T]he gaming model based on its own results can improve. So it creates its own memories, it gets smarter. The e-commerce model is the same thing***, but I do just remind people that we're much earlier in e-commerce. We have very little data in the marketplace. So if you think about transactional volume that we have in gaming, we've got most of the market inside our system. So the model is pretty complete from a data perspective. . . .
>
> E-commerce is newer. It's starting from an earlier place. We have much less data penetration. ***So we can't go and track*** like, okay, in a stable world, ***how much is the model improving because the model is going to be improving much more so from our team improving the model with changes and then just customers coming on***. Every new customer that pixels their site passes data to us, both engagement data and transactional data. So as we get customer ramp up, our data penetration in the market is going to go from very little to much greater. ***And as that happens, that's going to be a big catalyst for improvement in that category***.

29. When asked about recently improved performance in AppLovin's e-commerce vertical, Defendant Foroughi explicitly connected this performance to improvements in the Company's AI model and represented "the team is constantly improving" it, stating in relevant part:

> ***[T]he team is constantly improving the model***. We do a lot of testing. ***We saw a material lift in the model. We rolled it out. Advertisers saw a huge improvement in return on ad spend. They started putting more budget into our system quickly. So those are the types of things that really catalyze growth for us***. . . .
>
> ***Our system is constantly improving because our team is improving these models***. They do internal research, they use external research published in the AI field. These techniques can apply to what we do. And when they apply well, these advertisers see gains.

30. Another analyst asked Defendant Foroughi to provide more information about the model improvement that drove an improvement in AppLovin's e-commerce vertical and the anticipated impact of the AppLovin Ads GA rollout on the Company's financial performance. In response, Defendant Foroughi stated that AppLovin was "constantly improving the gaming models" "every single quarter", and that the impact of AppLovin Ads GA roll out would be

"noticeable", even if it might not immediately improve the Company's growth more generally, stating in relevant part:

> [T]aking a self-service platform and opening it up, I wouldn't imagine day 1 or month 1 or month 2 is really going to move the needle on the overall numbers. It's going to build over time. . . . I wouldn't expect it to be immediately impactful as a major growth catalyst. ***It will be noticeable in our numbers***. When it comes to improving the models, we don't call it out anymore. ***We're constantly improving the gaming models. It happens every single quarter that we find something***.

31. Defendant Foroughi also spoke to Defendants' work on a generative AI feature that would allow AppLovin's customers to create, at a lower cost, both video content for the Company's platform and interactive pages that show end-users advertised products. Defendant Foroughi represented that Defendants would make their interactive page tool more widely available "soon as its showing good performance", and that "we're going to have the video model go live as well", stating in relevant part:

> [T]he customers have to get more accustomed to our platform to know what types of creatives work so that they can build up production around the things that work and multiply out the count. More importantly, though, ***generative AI tools to build creatives in a really low-cost way in an automated way is on the way***. We already have in a pilot with over 100 customers, generative AI-based tools for one part of the ad unit. Our ads are a video plus then an interactive page and then follow-up of a shop preview dynamic product page. But that middle one, the interactive page is not something that these advertisers are accustomed to building because they don't need them on social or search.
>
> We're now generating those automatically for over 100 customers. ***We'll roll that out soon as it's showing good performance to the broader set of customers. And shortly, we're going to have the video model go live as well.*** We're going to run the same pilot process. We're going to make sure the video output looks good. But ***if we get to a place where the video model can help these customers create new video ads in bulk in cost of dollars versus cost of thousands of dollars, we expect the count of ads for these new customers on our platform is going to go up a lot***, and that will make them more competitive against the gaming customers that are on our platform.

32. On March 4, 2026, Defendant Stumpf appeared on behalf of AppLovin at Morgan Stanley's Technology, Media & Telecom conference. During that appearance, Defendant Stumpf

represented that "directed model enhancements and recursive learning" were "happening on an ongoing basis", and that this trend would continue as AppLovin grows, stating in relevant part:

> [W]hen we initially mentioned to investors in the public markets around the 20% to 30% we just wanted to frame for investors that there's a lot of opportunity there for continued growth with the core technology on the mobile gaming side of the business. ***We broke it down for investors very simply that between directed model enhancements and recursive learning that's happening on an ongoing basis, we should be able to get at least that 20% to 30%***. . . . What investors need to understand is that this technology is very nascent. So ***our engineers are continuing to come up with directed model enhancements to make the technology better. And as we grow and scale, what that means for the technology is that we're getting more data to feed into it, which then improves the technology over time and continues to stack and compound*** and as we expand out on things like e-commerce, that will continue to grow the technology's ability to scale and drive spend at the return goals of our advertisers.

33. On May 6, 2026, AppLovin filed a quarterly report on Form 10-Q with the SEC, reporting its financial results for the quarter ended March 31, 2026, and held a conference call to discuss the same. During that earnings call, Defendant Foroughi claimed that a "material model release" drove improved performance in the consumer vertical, representing that the models enjoyed "a virtuous circle, and it is working", suggesting that such improvements would continue and stating in relevant part:

> [T]hat brings me to the consumer vertical, which is growing even faster than gaming. This is still only 1.5-years-old product. I want people to really internalize that. And it is scaling at a pace that gets us very excited. A couple of weeks ago, ***we had another material model release that improves scale and return on ad spend significantly for our consumer advertisers***. ***These are the types of compounding improvements we have talked about on prior calls. The team improves the model, advertisers see better returns and they put more budget into our system. It is a virtuous cycle, and it is working***.

34. Defendant Foroughi also discussed Defendants' progress toward releasing the generative AI tool that he mentioned during the preceding earnings call. After discussing the importance of this tool because AppLovin offers "different and unique advertisement placement, Defendant Foroughi claimed Defendants were "going to roll it out to all accounts shortly", stating in relevant part:

> [T]he creative placement on our platform is much different than anywhere else in the world. Because it is so different and unique, advertisers have a problem coming to platform and investing in the creative resources necessary to make our platform scale. ***It was critical for us to get a model on top of the popular image and video generation models out so that we can hand to advertisers the capacity to just create ads out of the box that work for our platform***. We rolled out something called our interactive page generator earlier in the quarter. That's out to all customers.
>
> ***But more important is the video side. That's still in testing. We're going to roll it out to all accounts shortly***. And then that's important before we go to a general release as well because that was the point that I mentioned on the last earnings call, advertisers trip up on -- is ***a lot of advertisers don't even have video for a platform like us. We'll hand it to them with these tools***.

35. When an analyst specifically asked whether AppLovin had "figured [something] out about your underlying models that is leading to a faster pace of improvement", Defendant Foroughi reassured investors that Defendants would continue to constantly improve their AI models and as a result, given other statements tying these improvements to the improvements in the Company's performance, that AppLovin's performance would continue to improve. Specifically, Defendant Foroughi stated that Defendants were "further evolved at understanding how to improve these models", that "we have 100% seen faster improvements to the models, both across the consumer business and the gaming business", and that "we don't really see a reason why that's going to slow down", stating in relevant part:

> This is really a testament to the team. ***We're now further evolved at understanding how to improve these models***, right? So they understand the techniques. They've gotten more sophisticated at what they're doing.
>
> The AI research space, obviously, is seeing fast improvement, too. You've seen an insane amount of product releases in the large language model space in short order because of everything that's happening there. ***A lot of those same trends apply to us, but I think it starts with our team is just getting much smarter about the tests that they're doing***.
>
> ***So we have 100% seen faster improvements to the models, both across the consumer business and the gaming business. And we don't really see a reason why that's going to slow down***. As our team of researchers get smarter about the things that they're testing, the success rate goes up, which is going to enable us to continue to push the technology forward, to drive better return on ad spend.

36. The statements referenced in ¶¶ 25–35 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the generative AI video creative feature for the Company's AppLovin Ads platform was subject to significant development delays, making its release on the Company'stimeline unlikely; (ii) Defendants overstated the constancy with which AppLovin was improving its AI models; (iii) for these reasons, among others, AppLovin had significantly overstated the benefits and reliability of the purportedly "virtuous cycle" and "compounding" value proposition that its AI models provided to customers and to the Company; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

37. On July 13, 2026, a Bank of America Securities analyst published a note reporting softer-than-expected e-commerce ad growth for the month of June, raising concerns over the rollout of the Company's self-service platform, AppLovin Ads. Specifically, the Bank of America Securities analyst wrote "AppLovin's eCommerce footprint expanded at a slower pace in June" and "[w]eekly data has not shown a clear uptick since AppLovin [Ads] opened to all eComm advertisers on 6/22, suggesting a muted GA start." Bank of America Securities lowered its expectations of AppLovin's annual revenue, "assuming a slower initial GA ramp and 15k GA advertisers (vs. 20K prior) by the end of CY26."

38. Following publication of the note, AppLovin's stock price fell $64.13 per share, or 12.65%, to close at $442.85 per share on July 13, 2026.

**The Truth Continues to Emerge**

39. On August 5, 2026, AppLovin filed with the SEC a quarterly report on Form 10-Q reporting its financial results for the quarter ended June 30, 2026, issued a press release announcing the same, and held a conference call to discuss the same. Among other items, AppLovin reported revenue of $1.92 billion, below consensus estimates of $1.94 billion.

40. During the Q2 Earnings Call, Defendant Foroughi conceded that the Company's underwhelming revenue figures flowed from "model performance", the "single biggest driver" of growth of the Company's gaming vertical. Defendant Foroughi stated that Defendants had not "meaningful[ly]" improved their AI model as quickly as "normal", stating in relevant part:

> Gaming is still the majority of our revenue, and the single biggest driver of its growth is model performance. When our models improve, advertisers can profitably deploy more spend at their target return on ad spend goals and budgets naturally step up. This quarter came down to timing. ***Our pace of meaningful model improvement was lighter than normal during the quarter*** and the next step-up in model performance landed just after quarter end.

41. When asked "exactly what the sort of model breakthroughs that you were looking for that didn't happen", Defendant Foroughi again stated that Defendants "didn't have the same amount of uplift that we normally have in any other prior quarter", stating in relevant part:

> If you go back the last 12 quarters, every quarter, we've had really good growth, except for Q2 in single digits. . . . [E]very quarter that we've had these outsized growth rates, we've had improvements to our model. . . . [O]ur gaming growth model we had given you all back in the day included one sizable improvement per year, but constant improvement to the models as well as on an ongoing basis. ***In this case, in Q2, we didn't have the same amount of uplift that we normally have in any other prior quarter. That came right after the quarter***. So that's why Q3 has started really well, and that's why we've guided strong going forward.

42. Another analyst asked Defendant Foroughi for "any sense of why you didn't get the model uplift that you would have expected in the quarter", to which he responded, "***there's no guarantee that we're always going to have lifts in every single period of three months***," and "***there are going to be periods where we don't get material lifts***", stating in relevant part:

> It's R&D, right? ***Like there's no guarantee that we're always going to have lifts in every single period of 3 months***. The team is always working on lifts. And usually, in every single quarter, it's not one lift that we get. We compound multiple small lifts. The impact was just smaller in Q2, followed by a pretty material uplift in Q3 in the early part of Q3.
>
> And so that's just the reality of when you're building models. ***You're building models, you don't have a certainty on the impact of what you're testing***, ***you're testing hypotheses, hoping for a good result***. And so the system is a whole bunch of A/B tests looking for lifts. And ***there are going to be periods where we don't get material lifts***.

43. When asked about how AppLovin could improve its self-service platform, Defendant Foroughi revealed that Defendants had not yet rolled out the generative AI video tool that would purportedly make it easier for advertisers to generate campaigns quickly after signing up, stating in relevant part:

> The creative is the biggest hurdle in our system. So nothing has really changed there. Lengthy video plus interactive end card, which isn't a common ad unit, we can auto-generate the interactive end card with pretty high efficiency at this point. ***We're not at the point where we can yet get a high-quality video for 30 to 60 seconds in the hand of an advertiser out of the box. So that's still [a] work in progress***. And we have examples where it works, other examples where it doesn't work. The reality is, once we can get that to happen or we create alternative forms of templates that don't require a video, we'll be able to hand the advertisers a one-click campaign creation and that should resolve any sort of conversion rate issues on the flow. . . . [I]f you think about that like mid-market and up, probably has templates that match the creative needs on our platform. When you get into the SMBs that are signing up directly, they probably don't. And so we've got to resolve that as we go into wanting to get in more into long tail over time.

44. On this news, AppLovin's stock price fell $82.13 per share, or 19.66%, to close at $335.67 per share on August 6, 2026.

45. Following Defendants' revelations, on August 6, 2026, several analysts lowered their respective price targets for AppLovin's stock. For example, on August 6, 2026, RBC Capital Markets reduced its price target 17.9%, from $700 to $575, noting that "[t]he challenge in the quarter came from the gaming business and the pace of 'meaningful model improvements' being lighter than expected." On the same date, Piper Sandler downgraded AppLovin's stock to neutral

and reduced its price target from $665 to $385, writing that its "concern" was that "the frequency and magnitude of directed model improvements may need to be larger going forward in order to hit Street expect[ations]", and that "we have more questions than answers on beat/raise cadence from here". Wells Fargo downgraded AppLovin stock to equal weight from overweight and reduced its price target 37.9%, from $575 to $357, writing that "[market] share in mobile games plateauing which means: 1) growth more dependent on the [market] & take-rate, suggesting a lower multiple & 2) margin for error on model improvements each [quarter] is lower." Needham reduced its price target 28.6%, from $700 to $500, writing "we were surprised to hear the commentary on gen AI video creative and lead gen being delayed, which were previously supposed to be rolled out during the self-service launch."

46. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

47. During the Class Period, Defendants had both the motive and opportunity to commit fraud. During the Class Period, the Individual Defendants enriched themselves by selling ***260,065 shares*** of AppLovin common stock for ***over $109.1 million in proceeds***. Defendant Foroughi sold 246,310 shares of AppLovin common stock for over $101.6 million in proceeds, while Defendant Stumpf sold 13,755 shares of AppLovin common stock for over $7.5 million in proceeds.

48. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Defendants repeatedly spoke to their process in developing a generative AI video tool to incentivize new advertisers to sign up for AppLovin Ads, as alleged *supra* ¶¶ 31, 34 and the

constancy with which AppLovin was improving its AI models, as alleged *supra* ¶¶ 3, 23, 25, 27–30, 32–33, 35. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

49. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired AppLovin securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AppLovin securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AppLovin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AppLovin;
- whether the Individual Defendants caused AppLovin to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of AppLovin securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;
- AppLovin securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold AppLovin securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

58. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AppLovin securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire AppLovin securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for AppLovin securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about AppLovin's finances and business prospects.

62. By virtue of their positions at AppLovin, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant

knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of AppLovin, the Individual Defendants had knowledge of the details of AppLovin's internal affairs.

64. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of AppLovin. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to AppLovin's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of AppLovin securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning AppLovin's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired AppLovin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

65. During the Class Period, AppLovin securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of AppLovin securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the

other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of AppLovin securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of AppLovin securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

68. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69. During the Class Period, the Individual Defendants participated in the operation and management of AppLovin, and conducted and participated, directly and indirectly, in the conduct of AppLovin's business affairs. Because of their senior positions, they knew the adverse non-public information about AppLovin's misstatement of income and expenses and false financial statements.

70. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AppLovin's financial condition and results of operations, and to correct promptly any public statements issued by AppLovin which had become materially false or misleading.

71. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which AppLovin disseminated in the marketplace during the Class Period concerning AppLovin's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause AppLovin to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of AppLovin within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of AppLovin securities.

72. Each of the Individual Defendants, therefore, acted as a controlling person of AppLovin. By reason of their senior management positions and/or being directors of AppLovin, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, AppLovin to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of AppLovin and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AppLovin.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 16, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

**Pro hac vice* application forthcoming